FILED

2007 Feb-21  PM 03:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| **BESSIE FRANKS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )  **Civil Action No. CV-05-S-1727-NW** |
| | ) |
| **HARTFORD LIFE GROUP** | ) |
| **INSURANCE CO.,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION

Plaintiff Bessie Franks, a former employee of Sara Lee Corporation ("Sara Lee"), asserts claims under section 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  Plaintiff claims that she was wrongfully denied short-term and long-term disability benefits pursuant to her employer's group policies.  She named as defendants the Sara Lee Long-Term Disability Plan ("the Plan"), and Hartford Life Group Insurance Co. ("Hartford"), the insurer and claims administrator for the short-term and long-term disability policies.[1]  The action now is before the court on defendants' motion for summary judgment.[2]  Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that the motion should be denied.

---

[1] *See* doc. no. 15 (Amended Complaint).

[2] Doc. no. 20.

# PART ONE

## *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## PART TWO

### *Summary of Facts*

**A.**   *Plaintiff's Position with Sara Lee*

Plaintiff, Bessie Franks, was employed by Sara Lee as a Biscuit Assembler

from June of 1995 until July 3, 2003, when she ceased work and filed an application

for short-term disability benefits.[3] Sara Lee's job description for a Biscuit Assembler

states that, for a minimum of eight hours in a work day, the employee must be able

to work in temperatures less than or equal to 35 degrees Farenheit, and perform

repetitive motions.  The employee also must be able to perform the following tasks

for eight hours on a concrete floor: standing, stooping, walking, climbing, and lifting.

The employee also must be able to:  work in a wet environment; assemble, organize,

and fill trays as they travel down a conveyor; operate machinery; assure the

production line moves in a timely fashion; set up production equipment; monitor the

production area for trash and food debris on the floor; assemble boxes, trays, and

flaps; and maintain prompt and regular job attendance.  Additionally, the employee

must:  adhere to safety practices, food safety policies, and company policies; clean

---

[3]Doc. no. 22 (defendants' evidentiary submission), Exhibit A (Affidavit of Chris Shank), Appendix 1 (Administrative Record), at document bearing Bates Stamp No. 345.  ***Note:*** All future citations to the Administrative Record will state, "AR at [Bates Stamp No. of relevant document]."

up her work area at the end of a shift, including sweeping, picking up debris, and spraying down the area; maintain efficiency and quality standards; and perform other tasks as assigned.[4]

Plaintiff's supervisor completed a Physical Demands Analysis form on September 15, 2003. He indicated that, in an eight-hour work day, plaintiff would be required to stand for seven hours, and walk for one hour, with no sitting, and no ability to alternate sitting and standing as needed. He also indicated that plaintiff would not be required to perform pushing and pulling movements. She would receive two thirty-minute breaks each day, and the requirements of the job could not be modified.[5] On a later Physical Demands Analysis form dated June 16, 2004, plaintiff's supervisor indicated that the job would never require climbing, stooping, kneeling, crouching, reaching to the floor, or operation of a motor vehicle; that handling, reaching above shoulders and across, and bending at the waist would be required less than one-third of the time; that handling with two controls, grasping and turning movements, reaching below the shoulders, twisting of the head and back, and full upper extremity and whole body range of motion would be required one-third to two-thirds of the time; and that finger dexterity would always be required.[6]

---

[4]AR at 209-10.

[5]*Id.* at 336.

[6]*Id.* at 197.

**B.**    *The Relevant Disability Plans*

The Sara Lee Short-Term Disability Plan ("the STD Plan") was originally

issued by Continental Casualty Company ("CCC"), and the Sara Lee Long-Term

Disability Plan ("the LTD Plan) was originally issued by CNA Group Life Assurance

Company ("CNA").  Both plans are employee welfare benefit plans governed by

ERISA, and both provide benefits to Sara Lee employees.[7]  Hartford acquired both

plans, and assumed claims administration for the plans, in December 2003.[8]  Hartford

possesses full discretionary authority to construe and interpret the terms of both plans,

and to determine eligibility for benefits under the plans.[9]

**1.**    *The Short-Term Disability Plan*

The relevant portions of the STD Plan define a disability as follows:

"*Disability"* means that *Injury*[10] or *Sickness*[11] causes physical or

---

[7]Shank Affidavit, at ¶¶ 3-4.

[8]*Id.* at ¶ 4.

[9]*See* Shank Affidavit, Appendix 2 (Short-Term Disability Policy), at document bearing Bates Stamp No. 356 ("When making a benefit determination under the policy, *We* have discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy.") (emphasis in original).  *See also id.,* Appendix 3 (Long-Term Disability Policy), at documents bearing Bates Stamp Nos. 411 ("The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy."); 412 ("The Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine Your eligibility for and entitlement to benefits in accordance with the Plan.").  ***Note:*** All future citations to the Short-Term Disability Plan will be stated, "STD Plan, at [Bates Stamp No. of relevant document]."  All future citations to the Long-Term Disability Plan will be stated, "LTD Plan, at [Bates Stamp No. of relevant document]."

[10]Italics in the STD policy indicate a term which bears a special definition under the policy. "Injury" is defined as "bodily injury caused by an accident which results, directly and independently

mental impairment to such a degree of severity that *You*[12] are:

1.    continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and

2.    not working for wages in any occupation for which *You* are or become qualified by education, training or experience.[13]

The STD Policy defines the term "Material and Substantial Duties" as "the necessary functions of *Your Regular Occupation* which cannot be reasonably omitted or altered."[14]  It defines the term "Regular Occupation" as "the occupation that *You* are performing for income or wages on *Your Date of Disability*.[15]  It is not limited to the specific position *You* held with *Your* employer."[16]

A STD claimant is required to produce the following items, at her own expense, to prove her disability:

1.    The date *Your Disability* began;
2.    The cause of *Your Disability*;
3.    The prognosis of *Your Disability*;

---

of all other causes, in *Disability* which begins while *Your* coverage is in force."  STD Plan, at 364 (emphasis in original).

[11]The term "sickness" is defined as "sickness or disease causing *Disability* which begins while *Your* coverage is in force."  *Id.* at 365 (emphasis in original).

[12]The policy defines the terms "You," "Your," and "Yours" as "the employee to whom this certificate is issued and whose insurance is in force under the terms of the policy."  *Id.*

[13]*Id.* at 357 (emphasis in original).

[14]*Id.* at 364 (emphasis in original).

[15]The term "date of disability" is defined as "the date *We* determine *Your Injury* or *Sickness* impairs *Your* ability to perform *Your Regular Occupation.*"  *Id.* (emphasis in original).

[16]*Id.* at 365 (emphasis in original).

4.    Proof that *You* are receiving *Appropriate and Regular Care*[17] for *Your* condition from a *Doctor,*[18] who is someone other than *You* or a member of *Your immediate family,* whose specialty or expertise is the most appropriate for *your* disabling condition(s) according to *Generally Accepted Medical Practice.*[19]

5.    **Objective medical findings which support *Your Disability.* Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted n the practice of medicine, for *Your* disabling condition(s).**

6.    The extent of *Your Disability,* including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*.

7.    Appropriate documentation of *Your Weekly Earnings.* If applicable, appropriate, regular monthly documentation of *Your Disability Earnings.*[20]

8.    If *You* were contributing to the premium cost, *Your* employer must supply proof of *Your* appropriate payroll deductions.

9.    The name and address of any *Hospital or Health Care Facility*[21]

---

[17] "*Appropriate and Regular Care*' means that *You* are regularly visiting a *Doctor* as frequently as medically required to meet *Your* basic health needs.  The effect of the care should be of demonstrable medical value for *Your* disabling condition(s) to effectively attain and/or maintain *Maximum Medical Improvement.*"  STD Plan, at 364 (emphasis in original).

[18] The STD Plan more fully defines a "doctor" as

a person legally licensed to practice medicine, psychiatry, psychology or psychotherapy, who is neither *You* nor a member of *Your* immediate family.  A licensed medical practitioner is a *Doctor* if applicable state law requires that such practitioners be recognized for purposes of certification of *Disability,* and the treatment provided by the practitioner is within the scope of his or her license.

*Id.* (emphasis supplied).

[19] The term "generally accepted medical practice" is defined as "care and treatment which is consistent with relevant guidelines of national medical research and health care coverage organizations and governmental agencies."  *Id.*

[20] The term "disability earnings" is defined as "the wage or salary *You* earn from *Gainful Employment* after a *Disability* begins.  It does not include Social Security or any other *Disability* payment *You* receive as a result of *Your Disability.*"  *Id.* (emphasis in original).

[21] The term "hospital or health care facility" is defined as "a legally operated, accredited

where *You* have been treated for *Your Disability.*

10. If applicable, proof of incurred costs covered under other benefits included in the policy.[22]

The STD Policy also places the burden on the claimant to provide *continuing* proof of disability.  Specifically, the policy states:

> *You* may be asked to submit proof that *You* continue to be *Disabled* and are continuing to receive *Appropriate and Regular Care* of a *Doctor.*  Requests of this nature will only be as often as *We* feel reasonably necessary.  If so, this will be at *Your* expense and must be received within 30 days of *Our* request.[23]

**2.**    *The Long-Term Disability Plan*

The relevant portions of the LTD Plan define a disability as follows:

> *Disability* means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1) continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
> 2) not *Gainfully Employed.*[24]

---

facility licensed to provide full-time care and treatment for the condition(s) causing *Your Disability.* It is operated by a full-time staff or licensed physicians and registered nurses.  It does not include facilities which primarily provide custodial, educational, or rehabilitative care."  *Id.* (emphasis in original).

[22]*Id.* at 361 (italicized emphasis in original; boldface emphasis supplied).

[23]*Id.* (emphasis in original).

[24]The term "gainfully employed" is defined as "the performance of any occupation for wages, remuneration or profit, for which *You* are qualified by education, training or experience on a full-time or part-time basis, and which *We* approve and for which *We* reserve the right to modify approval in the future."  LTD Plan, at 409 (emphasis in original).

> After the *LTD Monthly Benefit*[25] has been payable for 24 months, *Disability* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> > 1) continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
> > 2) not *Gainfully Employed.*[26]

The "Elimination Period" is "the number of calendar days at the beginning of a continuous period of *Disability* for which no benefits are payable."[27]  Stated differently, a claimant must be continuously disabled for a certain number of days before she will be eligible for benefits under the LTD Plan.  The Elimination Period applicable to plaintiff's claim is 180 days.[28]  As with the STD Plan, a claimant bears the burdens of providing initial proof of disability to the Plan Administrator, and of providing continuing proof of disability upon request.[29]  The claimant may shoulder this burden by providing the same ten items as required to support a claim under the STD Plan.[30]

**C.**   *Plaintiff's Claim for Short-Term Disability Benefits*

On plaintiff's July 3, 2003 application for short-term disability benefits, her

---

[25]The term "monthly benefit" is defined as "that benefit shown in the *Schedule of Benefits* which applies to *You.*"  *Id.* (emphasis in original).

[26]LTD Plan, at 396 (emphasis in original).

[27]*Id.* at 408 (emphasis in original).

[28]*Id.* at 388.

[29]*Id.* at 405.

[30]*Id.  See supra,* pages 6-7.

treating orthopedic surgeon, Dr. O'Brien, indicated that her diagnoses were lumbar pain and lumbar herniated nucleus pulposus ("HNP").[31]  An MRI of plaintiff's back in June 2003 revealed a moderately severe disc herniation to the right of the L3-4 vertebrae, and a "very mild" bulge of the annulus at the L4-5 and L5-S1 vertebrae.[32] The radiologist interpreting the MRI indicated that there was no evidence of canal stenosis and no significant facet arthropathy.[33]  Dr. O'Brien also indicated that plaintiff was expected to be able to return to work, performing her full duties, on August 4, 2003.[34]

On July 12, 2003, CNA awarded plaintiff short-term disability benefits through August 3, 2003.[35]  CNA cautioned plaintiff that, if she was unable to return to work on August 4, 2003 as planned, she would have to submit *additional* medical information to support her continued disability.  CNA also advised plaintiff that a note from her physician "simply stating he/she is extending your disability will not be acceptable without supporting medical data."[36]

---

[31] AR at 345.

[32] *Id.* at 341.  One medical dictionary defines an "annulus" as a "ring or ringlike structure." *Dorland's Illustrated Medical Dictionary* 93 (30th ed. 2003).

[33] AR at 341.  "Spinal canal stenosis" is defined as "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space . . . ."  *Dorland's Illustrated Medical Dictionary* 1758 (30th ed. 2003).  "Arthropathy" is defined as "joint disease."  *Id.* at 156.

[34] AR at 341.

[35] AR at 274.

[36] *Id.*

Plaintiff subsequently received three lumber epidural steroid injections ("ESI's") on July 9, July 23, and August 6, 2003.[37]  On August 14, 2003, plaintiff returned to Dr. O'Brien, who reported that the ESI's "were of no benefit," gave plaintiff a note to be off work until further notice, and stated, "[s]he is in agreement with me not to have any surgery on her lumbar."[38]  CNA informed plaintiff that Dr. O'Brien's note, unsupported by any medical data, would be insufficient to support a continuation of her benefits.[39]  CNA subsequently requested additional medical information from Dr. O'Brien, and forwarded him a form which contained the following question, "Do you believe that Ms. Franks is capable of performing work which is primarily standing with occasional stooping, walking, climbing stairs and lifting up to 30 [pounds] occasionally?  Ms. Franks stands at a conveyor belt and is responsible for filling trays with biscuit/meat/cheese/egg."[40]  Dr. O'Brien responded that plaintiff is unable to stoop, lift, or bend.[41]

Dr. O'Brien's office notes of October 21, 2003 reveal that he does not "really expect her condition to improve."[42]  On November 18, 2003, Dr. O' Brien stated,

---

[37]AR at 338, 340, 342-43.

[38]*Id.* at 342, 346.

[39]*Id.* at 337.

[40]*Id.* at 335.

[41]*Id.*

[42]AR at 213.

"Her symptoms are static.  I do not expect them to improve a lot."[43]

Plaintiff also underwent a Functional Capacity Evaluation ("FCE") on November 19, 2003.  The therapists conducting the evaluation stated that plaintiff gave reliable and consistent effort, and she did not demonstrate any symptom magnification or self-limiting behaviors.[44]  The evaluation revealed that plaintiff could engage in "frequent" (*i.e.,* 2.7 to 5.3 hours a day) walking, climbing, sitting, standing, handling, and left-handed fingering.  She could engage in constant (*i.e.,* 5.4 to 8 hours a day) stooping, kneeling, crouching, reaching, and right-handed fingering. She could only occasionally (*i.e.,* 0 to 2.6 hours a day) perform pulling motions, but she could frequently perform pushing motions involving up to forty pounds.[45]  The evaluation lasted approximately three and one-half hours, and the therapists conducting the evaluation only actually observed plaintiff sitting for thirty minutes at a time, and observed her standing for twenty-one minutes at a time.[46]

CNA sent plaintiff a letter dated December 16, 2003, informing her that her claim for further short-term disability benefits was denied.  The letter stated:

> Your claim form states that your last day worked at [Sara Lee] was on 7-3-03.  You are claiming a disability from your occupation as

---

[43]*Id.*

[44]*Id.* at 300.

[45]*Id.* at 301.

[46]*Id.* at 300.

a Biscuit Assembler as of 7-4-03 due to Lumbar pain and Lumbar Herniated Nucleus Pulposus (HNP). Your job duties involve primarily standing, with occasional walking, bending, stooping, lifting up to 30lbs and climbing.

Benefits were approved and extended through 9-12-03 as you received treatment for your condition. We sent a form to Dr. O'Brien regarding your functionality for returning to work. Dr. O'Brien stated you were unable to return to work as you cannot stoop, lift, or bend. On your 10-21-03 office visit note, Dr. O'Brien indicated he does not expect your condition to improve and surgery was not recommended.

As the medical information received did not support the restrictions provided by Dr. O'Brien to preclude you from performing the material and substantial duties of your job, you were referred for a Functional Capacity Evaluation (FCE). We extended your benefits through 11-30-03, further benefits were pending the FCE results. Your evaluation was completed on 11-19-03.

The results of the FCE indicated that you are able to constantly stoop and crouch (bend), and occasionally lift 21-50 lbs. After reviewing your job requirements, Dr. O'Brien's restrictions are disproportionate with your FCE results. As the FCE results are within your job requirements, there is not a functional loss to preclude you from performing the material and substantial duties of your job. Therefore, benefits beyond 11-30-03 have been denied.[47]

The letter also informed plaintiff of her right to appeal, or to submit additional medical information in support of her claim.

One week later, on December 23, 2003, Dr. O'Brien submitted a letter to CNA, stating:

This letter is on behalf of Bessie Franks, who is currently not able

---

[47]AR at 263.

to return to work due to her medical condition. She states she has received a letter which discontinued her benefits. She has an established diagnosis of focal disc herniation of moderate degree extending into the right nerual foramen at the L3-4 disc interspace level. She also has mild broadbased bulge of the annulus present at both the L4-5 and L5-S1 levels. She also has subtle irregularity noted involving the posterior aspect of the patella. This is a probability of chondromalacia.[48] She has undergone a series of 3 epidural steroid injections along with pain medication. Please review the information we have provided and please resume her benefits.[49]

**D.**    *Plaintiff's Appeal from Denial of Short-Term Disability Benefits and Application for Long-Term Disability Benefits*

On February 2, 2004, CNA received an undated, handwritten letter from plaintiff, stating her intent to appeal the denial of short-term benefits.[50] On June 10, 2004, plaintiff's attorney simultaneously submitted a formal appeal from the denial of short-term benefits, and an application for long-term disability benefits.[51] Plaintiff's attorney also submitted the following additional documentation: a questionnaire and physical function assessment completed by Dr. O'Brien; additional medical records; a signed statement from plaintiff; letters from plaintiff's sister and co-worker; and a vocational assessment by a rehabilitation and vocational expert.

On the questionnaire Dr. O'Brien had completed on June 7, 2004, he stated that

---

[48]One medical dictionary defines "chondromalacia" as "softening of the articular cartilage, most frequently in the patella." *Dorland's Illustrated Medical Dictionary* 356 (30th ed. 2003).

[49]AR at 278.

[50]*Id.* at 276.

[51]*Id.* at 200-01.

plaintiff's diagnoses were lumbar pain and lumbar HNP, and that she had been treated with lumbar ESI's and anti-inflammatory medication.  Dr. O'Brien replied "yes" to the inquiry "[w]hether or not the medical impairment from which the claimant suffers could reasonably be expected to produce disabling pain," and indicated that her pain was "moderately severe."[52]  He also indicated that plaintiff had reached maximum medical improvement on January 1, 2004, and that she suffered a ten-percent impairment of the whole person.[53]

Updated records from Dr. O'Brien reveal that plaintiff had continued to see him approximately once each month since her application for short-term benefits.  Dr. O'Brien consistently stated that plaintiff's symptoms were unchanged, and he did not expect her condition to improve.  He ordered an MRI of her left knee in September of 2003 due to complaints of knee pain, but he did not believe that any surgical intervention was warranted.  After a motor vehicle accident in late December 2003, Dr. O'Brien did not feel that any additional diagnostic testing would be beneficial. He treated plaintiff with pain medication.[54]

Dr. O'Brien also completed a functional assessment of plaintiff on June 7, 2004.  He indicated that plaintiff could sit, walk, and stand each for one hour at a

---

[52]*Id.* at 211.

[53]*Id.* at 212.

[54]*Id.* at 213-15.

time, and for two total hours in an eight-hour work day.  He noted that these limitations were due to plaintiff's lumbar pain.  He also indicated that plaintiff would require the option to sit or stand as needed, and she would need to lie down during the day.  He noted that plaintiff could never lift, carry, climb, or push and pull with her legs.  She could occasionally (up to one-third of the time) push and pull with her arms, balance, stoop, kneel, crouch, crawl, and reach.  She could frequently (from one-third to two-thirds of the time) handle, finger, feel, talk, and hear.  She could never be exposed to extreme heat or cold, vibration, moving mechanical parts, or heights.  She could only occasionally be exposed to wetness, humidity, fumes, odors, dusts, mists, or gases, and could only occasionally drive automotive equipment.[55]

In her hand-written statement, plaintiff described the different types of work she had performed for Sara Lee.  She also stated that she suffered constant pain in her back, knees, and hips that prevented her from working and conducting other activities.  She stated that, during the November 19, 2003 FCE, she performed all the tasks she was asked to perform, but she suffered from such severe pain during the three days following the exam that she was bedridden and had to have help taking care of her personal needs.[56]  The statements submitted by plaintiff's co-workers —

---

[55]*Id.* at 216-17.

[56]*Id.* at 228-33.

one of whom is also plaintiff's sister — conveyed that plaintiff's back was preventing her from working.[57]

Thomas Elliott, a Licensed Professional Counselor and Rehabilitation and Vocational Expert hired by plaintiff's counsel, performed a vocational evaluation on June 7, 2004. Elliott based his assessment on his clinical impression of plaintiff, his review of Dr. O'Brien's medical records, and the results of intelligence testing. He described plaintiff's past work with Sara Lee as unskilled and of light to medium exertion, with physical demands of

> lifting/carrying from 20-50 lbs. on an occasionally [sic] basis and/or 10-20 lbs. more frequently; standing throughout the workday, with stationary standing for one hour at a time; frequent forward leaning at waist; frequent pushing/pulling with upper extremities; constant reaching, handling, fingering, gripping, grasping; normal near vision.[58]

Based on Dr. O'Brien's records and physical assessment of plaintiff, Elliott concluded that plaintiff could perform work at only a less than sedentary exertional level, and that she would be precluded from performing her past work.[59] Elliott also performed intelligence testing, and concluded that plaintiff was operating within the borderline level of intellectual functioning, at the 8th percentile rank.[60] Based on all

---

[57]AR at 234-35.

[58]*Id.* at 237.

[59]*Id.* at 239.

[60]*Id.* at 240.

of this data, and on plaintiff's subjective complaints, Elliott concluded that plaintiff had a 100-percent vocational disability rating; that she was precluded from any work due to her education, training, and experience; and that she was not a candidate for vocational training.[61]

In support of her claim for *long-term* disability benefits, plaintiff submitted a physician's statement from Dr. O'Brien dated June 9, 2004.  This form stated plaintiff's diagnoses as lumbar pain and lumbar HNP, and referenced MRI findings to confirm the diagnoses.  Dr. O'Brien noted that plaintiff was being treated with lumbar ESI's and anti-inflammatory medications, and that no surgical intervention was planned.  He stated that plaintiff experienced limitations in stooping, lifting, and bending, and that her prognosis was "fair."[62]

One of CNA's Nurse Case Managers reviewed plaintiff's file on June 16, 2004, and concluded plaintiff had presented no new medical evidence to indicate that she would be precluded from work activities.  CNA sent plaintiff a letter dated June 17, 2004, informing her of the deficiencies in her short-term benefits appeal, and also denying her claim for long-term benefits.  The letter summarized CNA's review of all the medical information plaintiff had submitted, and stated:

---

[61]*Id.* at 240-41.

[62]*Id.* at 206-07.

Although Ms. Franks complains of low back and knee pain, there is no new medical evidence provided, in the form of physical exam findings, to correlate with her MRI of Lumbar spine to indicate a loss in function.  While she reports she is unable to complete her job requirements, Dr. O'Brien's restrictions of no stooping, lifting, or bending is not supported. [sic]

We have fully reviewed this information, and find it provides us with no additional medical information that would alter our previous decision.[63]

The letter also informed plaintiff that, because she had not demonstrated a continuous disability during the 26-week Elimination Period, she was not eligible for long-term benefits.  Finally, CNA informed plaintiff that her file would be forwarded to the "Appeals Area" for their further review.[64]

**E.**    *Plaintiff's Second Appeal*

During this additional internal review, Hartford sent plaintiff's file to a peer review physician.  On the referral form, Hartford stated that plaintiff's job required "standing the entire 8 hour day along with stooping, bending and some lifting."[65]  Dr. Carl Huff, a physician board-certified in orthopaedic surgery, conducted the peer review.  He considered medical records and correspondence from Dr. O' Brien; plaintiff's MRI results; the November 19, 2003 FCE; Thomas Elliott's June 9, 2004

---

[63]AR at 190-91.

[64]*Id.*

[65]*Id.* at 165-66.

vocational evaluation; and plaintiff's hand-written letter describing her work activities.[66]  Dr. Huff also indicated that he spoke with Dr. O'Brien for approximately fifteen minutes on August 31, 2004.  After Dr. Huff discussed the results of plaintiff's FCE with Dr. O'Brien, he stated that Dr. O'Brien "agreed that Ms. Bessie Franks could return to full-time work with regard to the findings and limitations on the FCE."[67]  Dr. Huff also faxed a letter to Dr. O'Brien on September 1, 2004, stating:

> Thank you very much for taking about 15 minutes of your time to discuss the case of Bessie Mae Franks with me.  As we discussed, the purpose of the conversation was to clarify the reason for the claimant not returning to work.
>
> The following is the summary of our conversation:
>
> I summarized to you that the review of the record showed that the patient had not sustained an injury to her back.  The back pain is subjective with no objective basis for the back pain.  I also went over the findings of the Functional Capacity Evaluation with you, and this clearly showed that the claimant could return to work.
>
> You indicated to me that you would be willing to return the claimant to full-time work according to the findings of the Functional Capacity Evaluation of 11/19/03.
>
> . . . .
>
> The above represents my attempt to summarize our conversation.  Please make any changes, comments, or additions right on this letter (or on a separate sheet, if you wish).  This letter and any of your notations

---

[66]AR at 156-61.

[67]*Id.* at 161.

will become part of the medical record at the disability insurance carrier.

> Please provide your signature in the space below to acknowledge your agreement with the contents of this letter amended to included whatever changes you have made.  Then please fax this letter with your changes within one week . . . .  If you elect not to respond, the insurer may rely on this summary in its current form.[68]

Dr. O'Brien's office faxed a note to Dr. Huff on September 1, 2004, requesting that Dr. Huff promptly fax a copy of plaintiff's FCE for his review before he decided whether to sign and return Dr. Huff's letter.[69]  Hartford forwarded a copy of the FCE to Dr. O'Brien on September 2, 2004.[70]

On September 1, 2004, apparently before he had received a response from Dr. O'Brien, Dr. Huff submitted his report to Hartford.  Dr. Huff concluded that plaintiff suffered from low back pain without objective findings and further stated:

> This lady has inconsistencies in her imaging reports and her symptoms.  There is a disparity and disassociation between objective findings both on examination and imaging studies and the claimant's subjective complaints.  She is young and healthy, suffering from no chronic medical problems.  She has no history of any back injury whatsoever.  Her MRI scan, 6/16/03, showed a focal disc herniation to the right at L3-4 extending into the right neural foramen.  There is no indication in the report of any neural impingement, and in fact the radiologist, Robert Dunn, MD, states clearly there is no evidence of canal stenosis.  The subjective complaints that she has do not indicate a radicular pain.  She has never reported any neurologic complaints and

---

[68]*Id.* at 163-64.

[69]*Id.* at 149.

[70]*Id.* at 152.

none of the examinations have indicated a positive straight leg raising test or any neurologic deficits. The inconsistency is shown by the fact that she is more symptomatic on the left when her focal disc herniation is on the right. It is a well know [sic] fact that asymptomatic people can have disc herniation on MRI scan of the lumbar spine. Apparently this disc displacement is not causing any nerve impingement. The lack of significant mechanical dysfunction of her back is clearly demonstrated. The Functional Capacity Evaluation of 11/19/03 showed that the flexibility of her lumbar spine is more than remarkable. Her range of motion in lumbar flexion is 152% of normal. Lumbar lateral flexion to the left is 148% of normal. Lumbar lateral flexion to the right is 188% of normal. How can a person with mechanical dysfunction of the spine mobilize the lumbar region to this degree? This is a very strong inconsistency. She manifested capability of occasional pushing and pulling up to 100 pounds and lifting and carrying 35 pounds. As far as her job at [Sara Lee] is concerned, by the patient's own description, it was the men who did the heavier lifting of dumping the meat while the women made boxes. So, the degree of lifting at her work, by her own description, would be unlikely to reach a medium level. As far as the left knee is concerned, she reports pain and yet Dr. O'Brien never documented any effusion and even he opines that the knee MRI was normal in his note of 12/31/03. This observation about functionality would be true beginning at a time prior to November 2003.

This claimant as of 11/30/03 and beyond is able to return to full-time work at a medium level, except where it conflicts with the Functional Capacity Evaluation of 11/19/03 (detailed above and with which I concur).[71]

On September 2, 2004, a member of Hartford's Appeals Team sent a letter to plaintiff's attorney, informing him that Hartford had decided to uphold its prior decision to deny plaintiff's short-term benefits. More fully, the letter stated:

We have completed the appeal review with regards to your

---

[71]*Id.* at 161-62.

client's Short Term Disability claim.   The comprehensive review included an assessment by a Medical Consultant, Dr. Carl Huff who is Board Certified in Orthopaedic Surgery, Preventive Medicine and Independent Medical Examiners. Dr. O'Brien was contacted during this assessment. Based upon the available information we have determined that the Company's decision to terminate benefits was correct.

In reviewing the file it was noted that your client last worked as a Biscuit Assembler on July 3, 2003 due to lumbar pain and leg pain. It was initially determined that your client was unable to perform the duties of her occupation that required standing the 8 hour work day and benefits became payable after satisfying the elimination period.

However, based upon updated information including a Functional Capacity Evaluation it was determined that your client no longer met the definition of disability as defined in the policy and benefits were terminated as of November 30, 2003. Your client was notified of the decision in a letter dated December 16, 2003. Please reference that letter and all subsequent letters for information not repeated at this time including policy definitions.

The Physical Demands Analysis from your client's employer with regards to her occupational duties indicates she stands 7 hours, walks 1 hour, no pushing/pulling or lifting is involved.   We took into consideration all of the information submitted by the physicians and information from your client.

Dr. O'Brien stated in a letter dated December 23, 2003 that your client was unable to return to work. The letter included her diagnosis of focal disc herniation of moderate degree extending into the right nerual foramen at the L3-4 disc interspace level. It was also noted that your client had mild broad based bulge at both L4-5 and L5-S1 level. Her treatment with regards to epidural steroids was also noted.

However, when Dr. Huff spoke to Dr. O'Brien on August 31, 2004 he agreed that your client was able to return to work as of November 30, 2003. Dr. O'Brien agrees with the Functional Capacity

Evaluation that was performed on November 19, 2003.

> Therefore, based upon the available information we have determined that the termination of benefits was proper and is upheld. This completes your appeal review.   You have exhausted all administrative remedies offered by the appeals process.  This decision is final and binding.[72]

The letter also explained that Hartford's decision pertained only to plaintiff's *short-term* disability claim, and notified her that her claim for *long-term* benefits would be referred back to the "Claims Team" for further consideration.[73]

On October 13, 2004, Hartford sent a letter to plaintiff's attorney, reiterating its prior decision that plaintiff was not eligible for long-term disability benefits because she did not satisfy the 180-day Elimination Period.  More fully, the letter stated:

> Your client's Short-Term Disability benefits were approved through 11/30/2003.  On 12/16/2003, additional Short Term Disability benefits were denied because she no longer met the definition of disability and the appeal was upheld on 09/02/2004.  Since her disability ended on 11/30/2003 and her Long Term Disability elimination period would not have been satisfied until 12/20/2004, she is not eligible for Long Term Disability benefits and her claim has been closed.[74]

The letter also informed plaintiff of her right to appeal the decision, or to submit

---

[72]AR at 154-55.

[73]*Id.* at 155.

[74]AR at 80.

additional medical information, within 180 days.[75]

On February 9, 2005, plaintiff's attorney appealed this denial of long-term

benefits.  The appeal letter stated:

> This is Ms. Franks' appeal from the latest denial letter dated October 13, 2004.  In one of CNA/Hartford's denial letters dated September 2, 2004, the Hartford informed Ms. Franks that one of its reviewing physicians, a Dr. Huff, spoke to Dr. James O'Brien on October 31, 2004, and that he, Dr. O'Brien, agreed that Ms. Franks was able to return to work as of November 30, 2003.  Well, we didn't think that was true given that what Dr. O'Brien had previously written nor told Ms. Franks. [sic] Dr. O'Brien's medical records indicate that he was waiting to see a functional capacity exam that you were suppose [sic] to send him before making a judgment.  Of course, the problem with a FCE is that it cannot simulate a competitive work environment 5 days a week 8 hours a day.  Setting all that aside, we felt like Dr. Huff's report was inaccurate and sent Dr. O'Brien the information he requested.

> Dr. O'Brien confirmed that he did not agree with Dr. Huff, so we had him put his opinion in writing.  We sent Dr. O'Brien the FCE, his previous medical records and the Sara Lee job descriptions.  You will find his findings enclosed and contrary to what Dr. Huff has reported, it is Dr. O'Brien's opinion that Ms. Franks is unable to perform the physical demands of her job after November 30, 2003, and continues to remain disabled.[76]

Attached to the letter was a questionnaire that had been drafted by plaintiff's attorney

and completed by Dr. O'Brien on November 18, 2004.  The questionnaire asked Dr.

O'Brien to review his medical records, the job description for plaintiff's position, and

---

[75]*Id.* at 81.

[76]*Id.* at 129.

the results of plaintiff's FCE, and to answer "Yes" or "No" to all of the following questions:  (1) "Within a reasonable degree of medical certainty, was Ms. Franks physically <u>unable</u> to perform the physical demands of her job on or before November 30, 2003?"; (2) "Within a reasonable degree of medical certainty, was Ms. Franks physically unable to perform the physical demands of her job after November 30, 2003 and through the date of this letter?"; and (3) "Within a reasonable degree of medical certainty, is it your opinion that Ms. Franks is currently and for the future disabled from her job?"[77]  Dr. O'Brien answered "Yes" to all of the questions, without providing any further explanation or any additional medical records.[78]

Hartford sent a letter to plaintiff's attorney on March 29, 2005, stating that plaintiff's February 9 appeal had been denied, and the decision to deny plaintiff's long-term disability benefits would stand.[79]  Hartford reiterated the reasoning of its October 13, 2004 letter denying long-term benefits,[80] and also emphasized its reliance on the findings in plaintiff's FCE and Dr. Huff's report.  The letter stated:

> Based on the results of the November 19, 2003 FCE and the September 1, 2004 Independent Medical Record Review, we have determined that the decision to deny LTD Income benefits was appropriate.   While  you  stated  that  the  FCE  cannot  simulate  a

---

[77]AR at 131 (emphasis in original).

[78]*Id.*

[79]*Id.* at 121-24.

[80]*See supra* at 24-25 (text accompanying footnotes 74 & 75).

competitive work environment five days a week, eight hours a day, the fact remains that the FCE is the most objective measure of Ms. Franks' functionality during the time period in question. Ms. Franks' demonstrated abilities as measured by the FCE would not prevent her from performing the material and substantial duties of her own occupation. You have provided no information that suggests the results of the FCE are inaccurate or unreliable.[81]

Hartford also addressed the questionnaire completed by Dr. O'Brien on November 18, 2004.

Dr. O'Brien offers no explanation for his answer[s]. He does not address at all the FCE results of November 19, 2003, which reveal a much more detailed summary of Ms. Franks' level of functionality. It would appear difficult to dismiss, more than a year later the results of a comprehensive FCE by simply checking "yes" to the question: "was Ms. Franks physically <u>unable</u> to perform the physical demands of her job on or before November 30, 2003?"[82]

Finally, Hartford addressed the June 7, 2004 Functional Assessment form completed by Dr. O'Brien.[83]  Hartford concluded that Dr. O'Brien's assessments did not

at all appear consistent with Ms. Franks' demonstrated abilities. For example, on the June 7, 2004 Functional Assessment form Dr. O'Brien noted that Ms. Franks can never lift any amount of weight. However, during the November 19, 2003 FCE Ms. Franks demonstrated the ability to lift at the medium physical demand capability (21-50 lbs.) in low and mid lift activities at the light level (11-20 lbs.) in high lift activities. Furthermore, as stated previously, Ms. Franks' overall strength category as measured during the November 19, 2003 FCE was classified in the medium physical demand category. Ms. Franks' demonstrated abilities

---

[81]AR at 123.

[82]*Id.* (emphasis in original).

[83]*See supra,* at 15-16 (text accompanying footnote 55).

are not at all reflected in Dr. O'Brien's June 7, 2004 assessment or his November 18, 2004 questionnaire form.  Without further explanation, Dr. O'Brien's assessment is not well supported in comparison to the detailed FCE report.[84]

In conclusion, Hartford stated:

We have no reason to believe the FCE report and Dr. Huff's assessments of Ms. Franks' level of functionality are inappropriate.  Therefore, we must conclude that Ms. Franks was not continuously Disabled as defined by the policy throughout the Elimination Period.  Accordingly, she is not entitled to LTD benefits under the terms of the policy.[85]

Hartford advised plaintiff that her file was closed, and she had the right to file a civil action under ERISA.  This suit followed on July 8, 2005.[86]

## PART THREE

*Standard of Review under ERISA*

As a threshold matter, the court must determine the appropriate standard for reviewing Hartford's decision to deny benefits, because ERISA itself does not specify the standard applicable to the decisions of a claims administrator or other fiduciary. *See Jordan v. Metropolitan Life Insurance Co.*, 205 F. Supp. 2d 1302, 1305 (M.D. Fla. 2002) (citing, *e.g.*, *Marecek v. BellSouth Telecommunications*, 49 F.3d 702, 705 (11th Cir. 1995) (other citation omitted)).

---

[84]*Id.*

[85]*Id.*

[86]Plaintiff originally filed suit in the Circuit Court for Lauderdale County, Alabama, on July 8, 2005.  *See* Complaint, appended to doc. no. 1. (Notice of Removal).  Defendants timely removed the case to this court on August 12, 2005.  Doc. no. 1. (Notice of Removal).

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. Pivoting off the *Bruch* decision, the Eleventh Circuit has promulgated three standards of review applicable to the decisions of a claims administrator: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interests."[87]  *Buckley v. Metropolitan Life Insurance Co.*, 115 F.3d 936, 939 (11th Cir. 1997).  Here, the claims administrators of the STD and LTD Plans possess discretionary authority to construe Plan terms, and to determine eligibility for benefits.  Further, because Hartford serves as both claims administrator and insurer for the two plans, it has a conflict of interests.  *See Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1568 (11th Cir. 1990) (holding that "a strong conflict of interest exists when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims").  Both parties agree, therefore, that the heightened arbitrary and capricious

---

[87] These standards apply not only to an administrator's interpretation of a plan term, but also to the factual decisions of a claims administrator.  *See, e.g.*, *Shaw v. Connecticut General Life Insurance Co.*, 353 F.3d 1276, 1284-85 (11th Cir. 2003).

standard of review applies in this case.[88]

The applicability of the heightened arbitrary and capricious standard does not mean, however, that the conflict of interests is the court's sole (or even primary) focus. Instead, the court must first determine — on *de novo* review — whether defendants' interpretation of the policy provision at issue was "wrong." *See HCA Health Services of Georgia v. Employers Health Insurance Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001) ("'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claim administrator's plan interpretation."). Only if the court deems the administrator's interpretation to be erroneous on *de novo* review must it proceed further with the analysis. *See*, *e.g.*, *Brown*, 898 F.2d at 1566 n.12 ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary.") (italics supplied); *Freling v. Reliance Standard Life Insurance Co.*, 315 F. Supp. 2d 1277, 1286 (S.D. Fla. 2004) ("[A] court need only consider whether the administrator's decision was 'tainted by self-interest,' if it first finds that the administrator's determination is wrong.") (citation omitted). Simply put, if Hartford correctly concluded that plaintiff is not

---

[88]*See* doc. no. 21 (defendants' initial summary judgment brief), at 18-19; doc. no. 24 (plaintiff's response brief), at 17-18.

entitled to short-term or long-term disability benefits, the inquiry is at an end, and summary judgment is due to be granted in Hartford's favor.

However, "[i]f the court determines that the claims administrator's decision is 'wrong,' the court then proceeds to decide whether 'the claimant has proposed a 'reasonable' interpretation of the plan.'" *HCA Health Services of Georgia*, 240 F.3d at 994 (quoting *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir. 1994)). Assuming claimant's position is held to be untenable, summary judgment should be granted to the administrator on that basis alone. *See id*. Alternatively, if the claimant's reading of the provision at issue is reasonable, the court must *again* test the administrator's *wrong* interpretation, this time through the less discerning lense of "arbitrary and capricious" review. *See*, *e.g.*, *id.*; *Florence Nightingale Nursing Services*, *Inc. v. Blue Cross/Blue Shield*, 41 F.3d 1476, 1481 (11th Cir. 1995). An administrator's incorrect interpretation is not arbitrary and capricious if it is "reasonable": *i.e.*, if "there was a reasonable basis for the decision, based upon the facts known to the administrator at the time the decision was made." *Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1989).

When heightened review is in place, if both the claimant's interpretation and the administrator's wrong interpretation are reasonable, there is yet another level of scrutiny to be applied. *See HCA Health Services of Georgia*, 240 F.3d at 994 (noting

that "[t]he reason the claimant's reasonable interpretation does not [automatically] trump the claims administrator's wrong interpretation is because the plan documents explicitly grant the claims administrator discretion to interpret the plan").

> Under the heightened arbitrary and capricious standard of review, the burden shifts to the claims administrator to prove that its [erroneous, but reasonable] interpretation of the plan is not tainted by self-interest. The claims administrator satisfies this burden by showing that its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries. Even when the administrator satisfies this burden, the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious. If the court finds that the claims administrator fails to show that its plan interpretation benefits the class of participants and beneficiaries, the claims administrator's plan interpretation is not entitled to deference [and the claimant may be entitled to summary judgment].

*Id*. at 994-95 (internal citations omitted).

## PART FOUR

### *Was Hartford's Decision "Wrong"?*

Plaintiff asserts that Hartford's decision to deny her benefits was "wrong" based on: (1) the opinion of Dr. O'Brien, her treating physician, that she is disabled; (2) the results of the vocational evaluation performed by Thomas Elliott; (3) the written statements by her co-workers; and (4) the results of the FCE performed in November 2003. Hartford asserts that its decision to deny plaintiff's benefits was *not* "wrong" because: (1) plaintiff provided no objective evidence establishing her

inability to perform the material duties of her occupation, and (2) Dr. O'Brien's disability opinion is rife with inconsistencies and unsupported by medical evidence.

**A.**   *Dr. O'Brien's Opinion*

As noted above, both the STD Plan and the LTD Plan require a claimant to produce objective medical evidence — including "tests, procedures, or clinical examinations" — to support her disability.[89]   Dr. O'Brien has stated on several occasions that plaintiff is unable to perform the material duties of her job because of her back condition.  However, the only objective basis he ever offered for his opinion is plaintiff's June 2003 MRI, which reflected a "moderately severe" disc herniation to the right of plaintiff's L3-4 vertebrae, and a "very mild" bulge of the annulus at the L4-5 and L5-S1 vertebrae, but no canal stenosis or arthropathy.  Indeed, plaintiff's MRI results are the only objective test results in the entire record.

Even after reviewing the MRI, Dr. O'Brien opined that plaintiff would be able to return to work by August 4, 2003, approximately one month after her initial application for STD benefits.[90]  He later changed his opinion without explanation, without the benefit of any additional testing, and with no additional objective evidence reflecting a change in plaintiff's condition.  Indeed, Dr. O'Brien consistently

---

[89]*See supra,* at 7 (text accompanying footnote 22).

[90]*See supra,* at 10 (text accompanying footnotes 32-34).

stated that plaintiff's condition remained unchanged throughout his treatment of her. Moreover, Dr. O'Brien offered no explanation of how the conditions reflected in the MRI results would render plaintiff unable to do her job. He treated plaintiff's condition conservatively, with epidural injections and anti-inflammatory drugs, and he did not believe surgery was necessary. Additionally, Dr. Huff stated in his report that plaintiff's MRI results do not reflect a condition consistent with the pain and limitations plaintiff described, especially considering that plaintiff reported more severe symptoms on her left side, while her disc herniation was on the right. Even more to the point, Dr. Huff stated it is "well known" that individuals with test results similar to plaintiff's could suffer no symptoms at all.

Further, the court agrees with Hartford that it was not required to rely fully on Dr. O'Brien's opinions, as his records reflect many inconsistencies. As the Supreme Court held in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003), courts in ERISA cases "have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834.[91]  *See also*

---

[91]The Court explained its reasoning as follows:

As compared to consultants retained by a plan, it may be true that treating physicians, as a rule, have a greater opportunity to know and observe the patient as an individual.

*Richards v. Hartford Life and Accident Insurance Co.,* 356 F. Supp. 2d 1278, 1286 (S.D. Fla. 2004) (holding that it was not "wrong" for the administrator "to rely on the findings of an independent reviewing physician") (citations omitted).  Thus, courts have held that it is not "wrong" for an administrator to discredit a treating physician's opinion when the opinion is self-contradictory, inconsistent, or unsupported by medical evidence.  *See, e.g., Hallford v. Metropolitan Life Insurance Co.,* 367 F. Supp. 2d 1353, 1361-62 (N.D. Fla. 2005) (holding that it was not "wrong" for a claims administrator to reject a treating physician's opinion when other reviewing doctors had pointed out inconsistencies in that opinion); *Baker v. Hartford Life and Accident Insurance Co.,* 371 F. Supp. 2d 1352, 1363 (M.D. Fla. 2005) (holding that it was not "wrong" for the claims administrator to decline to give special weight to a treating physician's opinions when those opinions contained inconsistencies).

Dr. O'Brien's opinions in this case have varied significantly.  He first opined

---

Nor do we question the Court of Appeals' concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements. But the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks.  And if a consultant engaged by a plan may have an incentive to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled."

*Nord,* 538 U.S. at 832 (internal quotation marks and citations omitted).

that plaintiff would be able to return to work by August 4, 2003, approximately one month after she first filed for STD benefits.  By August 14, 2003, however, Dr. O'Brien had changed his mind, and gave plaintiff a note to be off work *indefinitely*. The apparent reason for this dramatic change in Dr. O'Brien's assessment is that plaintiff had not experienced significant relief from three epidural steroid injections. Dr. O'Brien's later assessments of plaintiff appear to be based entirely on plaintiff's subjective complaints of pain, as Dr. O'Brien later generally reports only that plaintiff's *symptoms* have not improved.  Dr. O'Brien's descriptions of plaintiff's functional limitations also have vacillated.  On October 1, 2003, when asked if plaintiff could perform work "which is primarily standing," Dr. O'Brien responded that plaintiff could not stoop, lift, or bend.  He did not mention any limitations on plaintiff's ability to stand.  Again on June 9, 2004, Dr. O'Brien did not include standing among plaintiff's physical limitations, but instead stated that her limitations included stooping, lifting, and bending, and characterized her prognosis as "fair." Two days earlier, however, Dr. O'Brien had completed a Functional Assessment form, indicating that plaintiff could sit, walk, and stand for only one hour at a time, and for only two total hours in an eight-hour work day, among other limitations. Based on these inconsistencies, and on the lack of objective medical evidence to support Dr. O'Brien's findings, the court concludes it was not "wrong" for Hartford

to reject Dr. O'Brien's opinions.[92]

**B.**   *Elliott's Vocational Evaluation*

The court also concludes it was not "wrong" for Hartford to not fully accept the assessment of Thomas Elliott, the vocational and rehabilitation specialist, that plaintiff is unable to perform the physical demands of her past work.   Mr. Elliott based his assessment of plaintiff's *physical* condition entirely on his review of Dr. O'Brien's records, which, as noted, contain significant inconsistencies and lack an objective foundation.[93]   Further, Mr. Elliott, as a vocational specialist, would not be qualified to give an *independent* medical evaluation of plaintiff's physical condition.

**C.**   *Statements by Plaintiff's Co-Workers*

It barely warrants mention that the statements by plaintiff's co-workers that

---

[92]Plaintiff also argues that the mere fact of Dr. O'Brien's and Dr. Huff's conflicting medical opinions regarding her disability status creates a fact dispute defeating summary judgment. *See* doc. no. 24 (plaintiff's brief), at 19-21.  The court disagrees with plaintiff, despite the Eleventh Circuit's decision in *Shaw v. Connecticut General Life Insurance Co.,* 353 F.3d 1276 (11th Cir. 2003).  In *Shaw,* the Eleventh Circuit found that "sharply conflicting evidence" from the plaintiff's physicians prevented the entry of summary judgment. *Id.* at 1286.  This court does not interpret *Shaw* as creating a rule that *any* conflict in the medical evidence should result in the denial of summary judgment.  Indeed, such a rule would preclude the entry of summary judgment in almost all ERISA cases, as the vast majority of cases will involve *som*e difference of medical opinion.  Instead, differing medical opinions will prevent the entry of summary judgment only when the differing opinions create a genuine issue of *material* fact.  Here, Dr. O'Brien's opinion would be insufficient to support a finding of disability, as his findings are inconsistent and unsupported by objective medical evidence.  Thus, his opinions are not "material" facts, and Dr. Huff's differing analysis of the medical evidence does not create a genuine dispute on a material fact.

[93]Mr. Elliott did conduct independent *psychological* testing on plaintiff.  The results of those tests are not material, however, because plaintiff is claiming disability based upon her back condition, not her mental limitations.

plaintiff could not do her job do not constitute objective medical evidence to support plaintiff's claim. Thus, these statements do not render Hartford's decision "wrong."

**D.**   *Functional Capacity Evaluation*

Finally, plaintiff argues that Hartford's non-disability decision was "wrong" because of the restrictions revealed in her November 2003 FCE. Plaintiff first asserts that the FCE, which lasted approximately three and one-half hours, did not accurately reflect the demands of an eight-hour work day. She also asserts that the FCE was an unreliable indicator of her ability to perform regular work, because she was bedridden from pain for three days after the exam. Despite similar arguments, however, other courts have consistently recognized that "[a] functional capacity evaluation is the best means of assessing an individual's functional level." *Fick v. Metropolitan Life Insurance Co.,* 347 F. Supp. 2d 1271, 1280 (S.D. Fla. 2004) (citing *Lake v. Hartford Life and Accident Insurance Co.,* 320 F. Supp. 2d 1240, 1249 (M.D. Fla. 2004)). *See also Wise v. Hartford Life and Accident Insurance Co.,* 403 F. Supp. 2d 1266, 1276-77 (N.D. Ga. 2005) (crediting the results of an FCE despite the acknowledgement that "a one-day evaluation is not without its limitations"); *Sejdic v. Group Long-Term Disability Plan for Employees of Homeside Lending, Inc.,* 348 F. Supp. 2d 1313, 1316, 1318-19 (M.D. Fla. 2004) (crediting the results of an FCE despite the plaintiff's report that she suffered severe pain after the evaluation). This court agrees with the

reasoning of the above cases, and concludes that the FCE plaintiff completed was a sufficiently reliable tool to measure her ability to perform the duties of her job.

The more important inquiry is whether the FCE results actually demonstrate that plaintiff can perform the essential duties of her regular occupation.[94]   Upon review of the FCE results and the requirements of plaintiff's job, the court concludes that the FCE results do *not* support plaintiff's physical ability to do her job.  The FCE revealed that, while plaintiff can perform stooping, kneeling, crouching, and reaching movements up to eight hours a day, she can walk, climb, sit, stand, and handle objects for only 2.7 to 5.3 hours a day.  There is some discrepancy in the record as to Sara Lee's assessment of the physical demands of plaintiff's job.[95]   Construing the facts in the light most favorable to plaintiff, however, her job requires her to stand, stoop, walk, climb, and lift for *eight* hours a day.  These demands, particularly with regard to standing, walking, and climbing, are inconsistent with the limitations stated in the FCE.  As noted above, the FCE remains the most complete assessment of plaintiff's

---

[94]Plaintiff's ability to perform the duties of her regular occupation is the relevant inquiry, even with regard to plaintiff's claim for LTD benefits.  The Plan term defining long-term disability as the inability to perform *any* occupation is not at issue here, as that definition only takes effect after LTD benefits have been payable for 24 months, and, here, plaintiff never received *any* LTD benefits.

[95]Sara Lee's official job description for plaintiff's position states that an employee will be required to stand, stoop, walk, climb, and lift for eight hours a day.  *See* AR at 209-10.  The Physical Demands Analysis forms completed by plaintiff's supervisor indicate that plaintiff would be required to stand for seven hours, and walk for one hour, in an eight-hour day.  Plaintiff would never be required to climb, stoop, kneel, crouch, reach to the floor, or operate a motor vehicle.  *See id.* at 197, 336.

physical abilities.  Additionally, the FCE can be considered an "objective medical finding" under the STD and LTD Plans, as both plans define that term to include "tests, procedures, or clinical examinations."[96]  Finally, there is no medical evidence to conflict, or to discredit, the findings of the FCE.  Even Dr. Huff, who stated that plaintiff could generally perform work at a medium level, concurred with the FCE and concluded that plaintiff could not perform even medium work if it conflicted with the FCE findings.

The court concludes, therefore, that the FCE results support plaintiff's argument that she is unable to perform the duties of her regular occupation.  At the very least, there is a genuine issue of material fact regarding whether Hartford's decision to deny plaintiff's benefits was "wrong."

## PART FIVE

*Was Hartford's "Wrong" Decision Nonetheless Reasonable?*

Having found a fact dispute regarding whether Hartford's non-disability decision was "wrong," the court must now evaluate whether the "wrong" decision was nonetheless "reasonable."  "[I]f reasonable grounds do not exist for the administrator's decision, then the decision [must] be deemed to be arbitrary and capricious," requiring reversal.  *Fick*, 347 F. Supp. 2d at 1281.  *See also Jett*, 890

---

[96]*See* STD Plan, at 361.

F.2d at 1139.  For all of the reasons already announced above, and the additional reasons set forth below, the court holds that Hartford lacked a reasonable basis for its determination, although it does not agree with all of plaintiff's arguments.

Plaintiff makes much of the manner in which Dr. Huff characterized his consultation with Dr. O'Brien.  She asserts that Dr. Huff should not have represented that Dr. O'Brien agreed plaintiff was not disabled, without first waiting for Dr. O'Brien to confirm his opinion by fax.  The court agrees that it would have been more prudent for Dr. Huff to await Dr. O'Brien's response before submitting his report to Hartford.  Nonetheless, Dr. Huff's premature opinion does not, in and of itself, render Hartford's decision unreasonable.  Dr. Huff did not rely solely on Dr. O'Brien's alleged concurrence to support his opinion that plaintiff is not disabled.  Further, even if Dr. Huff did misrepresent Dr. O'Brien's assessment, and even if Hartford did rely upon Dr. Huff's misrepresentation in deciding on September 2, 2004, to uphold its denial of plaintiff's benefits, Hartford had the benefit of reviewing Dr. O'Brien's later, direct assessment before making its final decision.  On February 9, 2005, plaintiff's attorney submitted a questionnaire completed by Dr. O'Brien, on which the doctor clearly indicated his belief that plaintiff was unable to meet the physical demands of her job.  Hartford explicitly considered this questionnaire before issuing its final decision on March 29, 2005.

Plaintiff also emphasizes that Dr. Huff conducted only a "paper review" of her file.  She asserts, on that basis, that Dr. Huff's opinions are unreliable and do not constitute objective medical evidence to support Hartford's decision.  In so arguing, plaintiff effectively asks the court to disregard the rule, pronounced by the Supreme Court in *Nord*, that courts need not afford any special weight to the opinion of a claimant's treating physician.  *See Nord,* 538 U.S. at 834; *see also Richards,* 356 F. Supp. 2d at 1286.  This court will not reject the clear mandate of the United States Supreme Court.  The court concludes, therefore, that it was not unreasonable for Hartford to rely on Dr. Huff's opinion *simply because he never personally examined plaintiff.*

The court can discern no reasonable basis, however, for Hartford's decision to disregard the limitations on plaintiff's ability to stand, walk, and climb set forth in the FCE.  In its initial brief, Hartford argues that it had a reasonable basis for its decision based upon its review of the FCE results and Dr. Huff's peer review opinion.[97]  Even after plaintiff pointed out the incompatibility between the FCE results and her job requirements in her response brief, Hartford did not address the issue in its reply. Instead, Hartford only states that its "denial was based upon a review of the totality of the record, including the well-supported findings of an independent peer review

---

[97]Doc. no. 21 (defendants' brief), at 29.

physician, and thus was entirely reasonable."[98]  If Hartford did rely on the FCE results and Dr. Huff's opinion, as it claims, it could not have reasonably concluded that plaintiff could perform her job duties.  Dr. Huff stated that plaintiff could perform medium-level work, *but only insofar as that work did not conflict with the limitations described in the FCE*.  The FCE revealed that plaintiff cannot stand, walk, and climb for eight hours in a work day, as her job requires.  Thus, at the very least, the results of the November 19, 2003 FCE call into question whether Hartford had a reasonable basis for its decision that plaintiff is not disabled under the terms of the STD and LTD Plans.[99]  As there is a genuine issue of material fact regarding whether Hartford had a reasonable basis for its decision, summary judgment can be denied on that basis alone, and the court need not proceed to evaluate whether Hartford's decision was tainted by self-interest.

## PART SIX

### *Conclusion*

---

[98]Doc. no. 27 (defendants' reply brief), at 7.

[99]Hartford attempts to argue that plaintiff's job varied from Sara Lee's formal job description for the position, and that plaintiff was physically able to do the job *as it was actually performed*. However, Hartford offers nothing more than conjecture on this point, and its own phrasing reveal's the argument's weakness.  Hartford states that "it is *questionable* whether Sara Lee's formal job description requiring eight hours of standing is relevant to whether she is able to perform her regular occupation."  *Id.* at 8 (emphasis supplied).  Any "questionable" facts must be construed in the light most favorable to plaintiff.  Thus, Hartford's argument only serves to highlight the existence of a genuine issue of material fact precluding the entry of summary judgment.

Based on all of the foregoing, genuine issues of material fact exist regarding whether plaintiff was disabled under the terms of the STD and LTD Plans.[100] Defendants' motion for summary judgment is due to be denied. An appropriate order will be entered contemporaneously herewith.

DONE this 21st day of February, 2007.

_____
United States District Judge

---

[100]The court offers no opinion on whether plaintiff would be considered disabled under the "any occupation" definition of disability, which takes effect only after a claimant has received LTD benefits for a period of twenty-four months. *See supra,* at 9 (text accompanying footnote 26). No evidence was collected on that matter during the administrative proceedings.